## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JAMES ZAVAGLIA,<br><br>Plaintiff,<br><br>v.<br><br>BOSTON UNIVERSITY SCHOOL OF MEDICINE,<br><br>Defendant. | CIVIL ACTION NO: 1:14-CV-13924-IT |

## DEFENDANT TRUSTEES OF BOSTON UNIVERSITY'S
## MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

For more than three years, from June 2011 until October 2014, Plaintiff James Zavaglia, an Instructional Technology Specialist ("Tech") in Boston University's Education Media Center ("EMC"), struggled to arrive on time for the start of his 10:30 a.m. shift. Plaintiff's inability to comply with the unambiguous requirements of his position jeopardized the curricular integrity of the University's School of Medicine and also imposed a significant burden on his supervisors, who frequently had to scramble to re-assign his duties to other Techs, and his colleagues, who had to do his work in addition to their own. Although Plaintiff's supervisors were clear about their expectations and gave him every opportunity to succeed, they ultimately concluded that Plaintiff's inability (or refusal) to call when he was going to be late and provide an accurate arrival time was a burden the EMC could no longer shoulder. Consequently, they terminated his employment on October 7, 2014.

Ignoring a long and well-documented history of inaccurate arrival times and poor communication, Plaintiff's Amended Complaint alleges that the University discriminated against him on the basis of a disability, and that his termination was in retaliation for exercising his

1

rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 (2012). However, as set forth below, the undisputed record establishes that there are no genuine issues as to any material fact and, pursuant to Fed. R. Civ. P. 56, Defendant Trustees of Boston University (the "University" or "BU") is entitled to summary judgment on Plaintiff's claims.

Plaintiff cannot establish a *prima facie* case of disability discrimination. The undisputed facts show that Plaintiff failed to demonstrate that he is a qualified individual with a disability or that the accommodation he sought -- to delay the start of his shift by 30 to 60 minutes -- was reasonable. Nevertheless, for a period of more than three years, Plaintiff's supervisors frequently allowed him to arrive at work between 60 and 90 minutes after his 10:30 a.m. shift was scheduled to begin, and asked only that he call to say he was going to be late and provide his EMC supervisors with an accurate arrival time. Moreover, the University had legitimate, nondiscriminatory reasons for denying Plaintiff's request for an accommodation for terminating his employment. Finally, there is no evidence that the University's stated reasons are a pretext to conceal discriminatory animus.

## **PROCEDURAL HISTORY**

On or about July 22, 2013, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging age and disability discrimination. The EEOC dismissed Plaintiff's complaint on July 23, 2014. Plaintiff filed his original complaint in this Court, alleging age and disability discrimination on October 16, 2014. After the University's motion to dismiss was granted without prejudice, Plaintiff filed an Amended Complaint on March 3, 2016.[1] The Court denied the University's motion to dismiss the Amended Complaint on May 3, 2016.

---

[1] On July 30, 2015, Plaintiff filed a charge of discrimination in the Massachusetts Commission Against Discrimination challenging his October 7, 2014 termination. That matter remains pending.

## FACTS RELEVANT TO THE UNIVERSITY'S MOTION[2]

Plaintiff was hired by Boston University ("BU" or the "University") as an Instructional Technology Specialist ("Tech") in the Education Media Center ("EMC") in 1998. SOF ¶¶ 1, 2. During Plaintiff's entire tenure at BU, his shift started at 10:30 a.m. and ended at 7:00 p.m. SOF ¶ 3.

The EMC at BU provides instructional services (such as audio, visual, educational technology, and student lab services) to the Boston University Medical Campus (the "Medical Campus"), comprised of the Schools of Medicine, Public Health, and Dental Medicine. SOF ¶ 4. As a Tech in the EMC, Plaintiff's primary responsibility was to support faculty, staff, and students in their use of technology for instruction and presentation in the various instructional and conference spaces on the Medical Campus. SOF ¶ 5. EMC Techs, including Plaintiff, were required to set-up, troubleshoot, operate, maintain, and break-down the instructional technology used for classes, events, and meetings. SOF ¶ 6. Set-ups require Techs, including Plaintiff, to get all of the instructional technology equipment ready for a class before it starts, and breakdowns require Techs to move the equipment out or ensure that it is still running at the end of class. SOF ¶ 7.

During the relevant period, Medical Campus classes, meetings, conferences and other events were typically scheduled between 8:30 a.m. and 8:50 p.m., Monday through Friday. Classes and other events typically started on the hour or on the half hour (i.e., 9:00 a.m. or 2:30 p.m.) and ended ten minutes before the hour or twenty minutes after the hour (i.e., 9:50 a.m. or 3:20 p.m.), allowing a 10-minute window of time for the Techs to prepare the classrooms and the instructors for on-time starts. SOF ¶ 10. At that time, the EMC had six Techs who covered the

---

[2] The facts summarized herein are set forth in detail in Defendant's Statement of Material Facts ("SOF"), citations to which are hereafter designated as "SOF ¶ __."  The SOF relies on Exhibits 1 through 20, which are filed herewith.

workday, which ran from 7:30 a.m. until 9:30 p.m. The EMC staggered the start times of the

Techs to ensure that the busiest times of day had sufficient coverage. Accordingly, two Techs

worked from 7:30 a.m. until 4:00 p.m. (covering the School of Medicine's two large

auditoriums), one Tech worked from 8:00 a.m. until 4:30 p.m., one Tech worked from 8:30 a.m.

until 5:00 p.m., one Tech worked from 10:30 a.m. until 7:00 p.m., and one Tech worked from

1:00 p.m. until 9:30 p.m.. SOF ¶ 11.

Not infrequently, the number of events starting at the same time exceeded the number of

available Techs. In such instances, each Tech would be responsible for setting up for multiple

events that may be starting at the same time. Consequently, it was essential that the Techs arrive

on time for set-ups in support of curricular and extracurricular activities. SOF ¶¶ 12, 13.

Beginning in June 2011, two of Plaintiff's supervisors, Lucy Milne and Kirsten Martin,

had several conversations with him about his persistent inability to arrive on time for his 10:30

a.m. shift. Plaintiff assured his supervisors that he would take steps to arrive on time. During

these conversations, Ms. Milne and Ms. Martin reminded Plaintiff that his persistent tardiness

made it difficult to assign staffing resources, thus impacting the day-to-day operations of the

EMC. SOF ¶ 14. Notwithstanding these assurances, Plaintiff continued to arrive late to work

throughout the summer and into the fall. As a result, on October 6, 2011 Plaintiff was given a

written warning for habitual tardiness. SOF ¶ 15.

In late October 2011, Plaintiff sought and was approved for intermittent leave pursuant to

the Family Medical Leave Act ("FMLA"). In support of his request for intermittent leave,

Plaintiff's physician completed the FMLA certification, noting that Plaintiff needed time off for

a total of three appointments each month with his chiropractor, osteopathic doctor and physical

therapist. Plaintiff's physician added that Plaintiff suffered from episodic "flare-ups" of back

4

pain that caused him pain and prevented him from working approximately once per month. The University approved Plaintiff's request for intermittent FMLA. SOF ¶ 16. In August 2012, Plaintiff requested intermittent FMLA for episodic "flare-ups." In support of his request, Plaintiff's chiropractor, Dr. Mark Friedman, completed the required certification. Dr. Friedman noted that Plaintiff "may have difficulty driving to work and getting ready in the [morning]. He may have prob[lems] lifting." Dr. Friedman opined that Plaintiff's flare-ups may occur once or twice over a period of three weeks to one month, and were expected to last between one and three hours per episode. The University approved this request. SOF ¶ 17.

To be able to assign staffing resources when Plaintiff was experiencing a "flare up" and using approved FMLA, Plaintiff's supervisors asked him to do two things: (1) call before 10:00 a.m. to notify his supervisor that he was using FMLA time and therefore was going to be arriving after 10:30 a.m., and (2) provide his supervisor with an accurate arrival time. Plaintiff understood these procedures. SOF ¶ 18. However, despite these clear instructions, between June and November 2012, Plaintiff repeatedly failed to comply with the notification procedures. In September and October 2012 alone, there were 16 instances in which Plaintiff either failed to call to inform his supervisor that he was going to be late, called very close to or after 10:30 a.m. to report that he would be late, or provided an inaccurate arrival time. On several occasions, Plaintiff was late to work not because he was using intermittent FMLA, but because he was stuck in traffic or because there was construction along his route. SOF ¶ 19.

Plaintiff's supervisors detailed their concerns in a second written warning, dated November 14, 2012. They explained that the EMC would continue to accommodate Plaintiff's need for intermittent FMLA, but that he would be "held accountable for excessive non-FMLA related tardiness" and would also be held accountable when he failed to follow the notification

procedures. SOF ¶ 20. Plaintiff knew that his failure to follow proper notification procedures made it extremely difficult for his supervisors to assign limited staffing resources to the scheduled events and classes. Plaintiff also understood that even a 10- to 15-minute difference between the time he said he was going to arrive and the time he actually arrived had a significant impact on EMC's ability to support the School of Medicine's curriculum. SOF ¶ 21.

Despite two written warnings and an understanding of the importance of adhering to the notification procedures, Plaintiff's compliance did not improve significantly in 2013. Between early January 2013 and late March 2013, there were 21 occasions on which Plaintiff failed to comply with the notification procedures. SOF ¶ 22.

Plaintiff first requested a disability accommodation in mid-November 2012, asking for "1/2 hour to one hour adjustment to work schedule per day," or to be permitted to arrive to work between 11:00 a.m. and 11:30 a.m. every day. SOF ¶ 23. Plaintiff supplemented his request with a December 5, 2012 note from his chiropractor, Dr. Friedman, who wrote that Plaintiff needed to "adjust his work schedule to accommodate an exercise program to maintain functionality and chiropractic care." SOF ¶ 25. In early 2013, the University asked Plaintiff to submit additional medical information in support of his request. In response, on March 14, 2013, Dr. Friedman wrote that Plaintiff "insists that [he] has to perform the exercises in the morning because it allows him to loosen up which therefore allows him to stand, walk, bend, lift and carry which are integral parts of his work activities." However, Dr. Friedman did not articulate a connection between Plaintiff's medical condition and his desire to perform the exercise program in the morning. Dr. Friedman also did not offer any medical reason for Plaintiff needing to arrive to work between 30 and 60 minutes after his scheduled 10:30 a.m. start time.[3] SOF ¶¶ 28, 29.

---

[3] On March 4, 2014, Plaintiff submitted a note from his osteopath, Dr. David Driscoll, who wrote that "for medical reasons it is necessary that [Plaintiff] be able to walk and stretch every half hour away from his desk." Dr. Driscoll's

On April 4, 2013, the University informed Plaintiff that it was unable to advise the EMC that it should grant Plaintiff's request for a schedule change as a reasonable accommodation of a disability. SOF ¶ 32. In the April 4 letter, the University also noted that Plaintiff did not apply for a vacancy in the EMC for the 1:00 p.m. to 9:30 p.m. Tech shift, even though working this shift would have allowed Plaintiff more time in the morning to complete his exercise program and also arrive to work on time. SOF ¶ 33.

Notwithstanding the University's denial of Plaintiff' request for a disability accommodation, his supervisors regularly allowed Plaintiff to come in later than 10:30 a.m. SOF ¶ 36. Moreover, between October 2011 and October 7, 2014, the date on which Plaintiff's employment was terminated, he was approved for intermittent FMLA, which allowed him to take time off for medical appointments and come in late whenever necessary. SOF ¶ 37.

Nevertheless, Plaintiff's inability to comply with the notification procedures continued. On March 28, 2014 and April 9, 2014, Plaintiff's supervisors met with him to discuss the importance of providing the EMC with an accurate expected arrival time and to reiterate their expectation that Plaintiff report directly to the department upon arrival rather than first stopping at classrooms. SOF ¶¶ 38, 39. However, between March 28, 2014 and April 23, 2014, there were 8 instances in which Plaintiff either did not provide an accurate arrival time or did not report directly to the office. Plaintiff received his third written warning on April 29, 2014. SOF ¶ 40.

Plaintiff showed no improvement between April 2014 and June 2014. As a result, Plaintiff was given a final warning letter on June 26, 2014. SOF ¶ 41. The letter provided specific examples of deficiencies in Plaintiff's performance and explained yet again that

---

March 4, 2014 note made no mention of a schedule change. SOF ¶ 34. On June 30, 2014, Plaintiff submitted another note from Dr. Driscoll. In the note, Dr. Driscoll wrote that due to chronic back pain, Plaintiff "should not remain seated for longer than 30 minutes at a time. He should get up and walk around, stretch and exercise for at least 15 minutes at a time." Again, Dr. Driscoll made no mention of a schedule change. SOF ¶ 36.

Plaintiff's persistent inability to provide an accurate arrival time imposed a significant hardship on Plaintiff's supervisors and co-workers in scheduling appropriate coverage for classes and other events on the Medical Campus. SOF ¶ 42. The June 26, 2014 letter concluded by outlining the actions Plaintiff needed to take to save his job, including calling by 10:00 a.m. if he was going to be late, reporting an accurate arrival time, and notifying his supervisors in advance if he had an off-campus appointment. SOF ¶ 43.

Between June 26, 2014 and October 7, 2014, Ms. Milne and Plaintiff's direct supervisor, Jana Mulkern, met with him five times. In each of these meetings, they communicated the ongoing issues with Plaintiff's work performance. Despite their efforts, Plaintiff failed to meet the clear and unambiguous requirements of his position. Having finally lost confidence in Plaintiff's ability to perform the core functions of his job as an Instructional Technology Specialist, Ms. Milne terminated Plaintiff's employment on October 7, 2014. SOF ¶ 45.

## **STANDARD OF REVIEW**

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if its resolution might affect the outcome of the case under the controlling law." *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted). "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." *Id.* (citation omitted).

By invoking summary judgment, "the moving party in effect declares that the evidence is insufficient to support the nonmoving party's case." *United States v. One Parcel of Real Prop. (Great Harbor Neck, New Shoreham, R.I.)*, 960 F.2d 200, 204 (1st Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "To succeed in showing that there is no genuine

dispute of material fact," the moving party must "'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" *Ocasio-Hernández v. Fortuño-Burset*, 777 F.3d 1, 4-5 (1st Cir. 2015) (quoting *Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir. 2000)).

Conversely, "to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." *ATC Realty, LLC v. Town of Kingston, N.H.*, 303 F.3d 91, 94 (1st Cir. 2002) (internal quotations and citation omitted). That is, the non-moving party must set forth specific, material facts showing that there is a genuine disagreement as to some material fact. *One Parcel of Real Prop.*, 960 F.2d at 204 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Cochran*, 328 F.3d at 6 (citation omitted). Although this review "is favorable to the nonmoving party . . . it does not give him a free pass to trial," *Hannon v. Beard*, 645 F.3d 45, 48 (1st Cir. 2011), and the court may disregard "conclusory allegations, improbable inferences, and unsupported speculation." *Cochran*, 328 F.3d at 6 (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).

## ARGUMENT

### I.   Plaintiff Was Not Denied A Reasonable Accommodation For His Disability.[4]

Plaintiff's first claim is that the University failed to reasonably accommodate his

---

[4] Solely for the purpose of this motion, the University assumes that Plaintiff has a disability under the ADA.

disability in violation of the ADA. Specifically, he alleges that his disability "require[d] a certain work schedule which the Defendant rejected." Am. Compl. ¶ 5. Plaintiff further alleges that his disability is a back injury and that he was qualified to perform the essential functions of his job as a Tech with reasonable accommodations. *Id.* ¶¶ 6.c, 6.d. In November 2012, Plaintiff asked to come to work between 30 and 60 minutes late as an accommodation for his alleged disability. SOF ¶ 23. After several discussions and a review of information provided by Plaintiff's treatment provider, BU denied Plaintiff's request on April 4, 2013. SOF ¶¶ 24-32.

To survive summary judgment on his "failure to accommodate" claim, Plaintiff must: (a) "furnish sufficient admissible evidence [he] is a qualified individual with a disability within the meaning of the ADA;" (b) "establish that [he] worked for an employer covered by the ADA;" and (c) "demonstrate that [the University], despite its knowledge of [Plaintiff's] limitations, did not accommodate those limitations."[5] *Orta–Castro v. Merck, Sharp & Dohme Quimica P.R. Inc.*, 447 F.3d 105, 112 (1st Cir. 2006). *See also Estades Negroni v. Assoc. Corp. of N. Am.*, 377 F.3d 58, 63 (1st Cir. 2004).

### A.      Plaintiff Is Not A Qualified Individual With A Disability.

Under the ADA, a "qualified individual" is a person who, with or without reasonable accommodations, can perform the essential functions of his job. *See Mulloy v. Acushnet Co.*, 460 F.3d 141, 147 (1st Cir. 2006). "Essential functions" are the fundamental job duties of a position that an individual with a disability is actually required to perform. *See* 29 C.F.R. § 1630.2(n)(2)(1); *Mulloy*, 460 F.3d at 147. Evidence of whether a particular function is essential includes "the employer's judgment as to which functions are essential," "written job descriptions

---

[5] The burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny does not apply to ADA discrimination claims based on an alleged failure to make reasonable accommodation. *See Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 n. 3 (1st Cir. 2001); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999).

prepared before advertising or interviewing applicants for the job," "work experience of past incumbents in the job," "and/or the current work experience of incumbents in similar jobs."[6] 29 C.F.R. § 1630.2(n)(3); *see also Kvorjak v. Maine*, 259 F.3d 48, 55 (1st Cir. 2001). A job function also may be essential if there are a limited number of employees among whom performance of the job can be distributed. *See* 29 C.F.R. § 1630.2(n)(2)(ii). Finally, a "reasonable" accommodation can never involve the elimination of an essential function. *See Mulloy*, 460 F.3d at 153; *Kvorjak*, 239 F.3d at 57.

Here, Plaintiff fails to demonstrate that he could perform the essential functions of his job as an EMC Tech because there is no evidence whatsoever that his requested accommodation, or any accommodation at all, would enable Plaintiff to arrive on time or properly comply with the notification procedures. Simply put, in view of Plaintiff's longstanding history of tardiness and poor communication, "there [is] literally nothing in the record to suggest that the future would look different from the past." *See Moore-Fotso v. Bd. of Educ. Of Chicago*, No. 12-CV-10419, 2016 WL 5476235, at *9-10 (N.D. Ill. Sept. 29, 2016) (internal quotation and citation omitted) (plaintiff was not a "qualified individual" where her long history of tardiness and unexplained absence predated her request for accommodation).

1.  <u>Punctuality And Predictable Arrival Times Are "Essential Functions" Of The Tech Position</u>.

Where a position requires that tasks be performed at a particular time and in a particular place, attendance and punctuality are essential functions of the job. *Andujar v. IPC Intern. Corp.*, 583 F. Supp.2d 213, 218 (D. Mass. 2008) (holding that timeliness was an essential function of a

---

[6] "In the absence of evidence of discriminatory animus," courts "generally give substantial weight to the employer's view of job requirements." *Ward v. Mass. Health Research Inst., Inc.*, 209 F.3d 29, 34 (1st Cir. 2000). Put differently, the inquiry into essential functions "is not intended to second guess the employer or to require the employer to lower company standards." *Mason v. Avaya Communications, Inc.*, 357 F.3d 1114, 1119 (10th Cir.2004) (internal quotation and citation omitted).

mall security guard's job, as he was "responsible for ensuring that the Mall doors were unlocked, that the elevators and music were turned on, and that tenants were open for business" prior to shoppers' arrival).[7] *See, e.g.*, *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 213 (4th Cir. 1994) (regular attendance at specified times essential function of teaching position); *Guice–Mills v. Derwinski*, 967 F.2d 794, 798 (2d Cir. 1992) (commencing shift at particular time could be essential requirement of head nurse position). Punctuality is particularly essential when there is a "limited number of employees available among whom the performance of that job function can be distributed." *Salmon v. Dade County School Bd.*, 4 F. Supp.2d 1157, 1161 (S.D. Fla. 1998) (holding that timeliness was essential for a guidance counselor because when she arrived late, counseling services were "simply not provided" to students); *see Beem v. Providence Health & Services*, No. CV-10-0037-JLQ, 2011 WL 4852301, at *4 (E.D. Wash. Oct. 13, 2011) (holding that unpredictability of assignments was indicative of the need for punctuality rather than flexibility in a lab researcher's schedule).  Like those of the mall security guard in *Andujar*, the duties of a Tech are preparatory in nature: they involve setting up classroom technology prior to regularly-scheduled classes so that the lecture can proceed. Thus, these duties require the Techs to be present on campus, and do not offer flexibility in terms of time spent on the job. Classes and events on the BU Medical Campus begin and end at fixed times pursuant to a written schedule, and therefore it is critical that the EMC Techs arrive in time to set-up the audio, video, and other technology that is used for each class or event. Consequently, the Tech job cannot be delayed, but the duties of a Tech, by their very nature, must be performed at specific times and in specific locations.

---

[7] The facts of this case are distinguishable from *Ward v. Mass. Health Research Inst., Inc.*, 209 F.3d 29 (1st Cir. 2000). In *Ward*, the First Circuit explained that timely attendance was not an essential function of the position because there was "[no] evidence that the nature of [plaintiff's] position require[d] that he be present during specific hours of the day . . . so long as he work[ed] the requisite 7.5 hours per day." 209 F.3d at 35.

Making it more difficult was the fact that each Tech often has more than one set-up to complete at or about the same time. A late (or unpredictable) arrival by one Tech adversely impacts not only the Medical School curriculum, but also imposes a significant burden on the other Techs. *See Stipe v. Shineski*, 690 F. Supp.2d 850, 879-80 (E.D. Mo. 2010) (explaining that an employer is not required to reassign the duties of other employees to compensate for the unpredicted tardiness of the plaintiff). In short, Plaintiff's chronic tardiness and inability to comply with the notification procedures rendered him unable to fulfill the essential function of punctual and predictable attendance. *See id. See also Spangler v. Federal Home Loan Bank of Des Moines,* 278 F.3d 847, 850 (8th Cir. 2002).

Furthermore, Section 202.2 of the University's Employee Handbook makes clear that employees are "expected to begin work on time" and also makes clear that if "an employee's arrival to work is to be delayed, the employee is expected to notify his or her immediate supervisor of the delay and the anticipated arrival time as soon as practicable." SOF ¶¶ 18-20 & Ex. 6, 7. There is ample evidence in the record that Plaintiff was reminded of these expectations on several occasions. In light of the importance of Plaintiff's timely presence at his job, and in conjunction with BU's emphasis on the importance of punctuality, the Court should hold that punctuality is an essential function of Plaintiff's job as a Tech.

Finally, the Court should reject any effort by Plaintiff to demonstrate the existence of a genuine issue of material fact by asserting that he was approved for intermittent FMLA and therefore permitted to come in late when necessary. The fact that Plaintiff's supervisors allowed him to exercise his FMLA rights and come in late when he needed to do so fails to demonstrate that punctuality was not an essential function of the job. *See Andujar*, 583 F. Supp.2d at 218 (fact that employee's supervisor periodically allowed him to come in late "fails to demonstrate that

punctuality was not an essential function of the job").

      2.      <u>Plaintiff Failed To Identify A Reasonable Accommodation That Would Enable Him To Perform The Essential Functions Of His Job</u>.

To prove that an accommodation is "reasonable," a plaintiff needs to present evidence both that the proposed accommodation would enable him to perform the essential functions of his job and also that, at least on the face of things, the proposed accommodation is feasible for the employer under the circumstances. *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001). In other words, the burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of his job rests with that employee. *See Garcia-Ayala v. Lederle Parenternals, Inc.*, 212 F.3d 638, 648 (1st Cir. 2000). Although a reasonable accommodation may include job restructuring, 42 U.S.C. § 12111(9)(B), an employer need not exempt an employee from performing essential functions, nor need it reallocate essential functions to other employees. *Feliciano v. Rhode Island*, 160 F.3d 780, 785 (1st Cir.1998); *Soto-Ocasio v. Fed. Express Corp.*, 150 F.3d 14, 20 (1st Cir.1998).

Here, Plaintiff has failed to present any evidence that his requested accommodation – arriving to work between 30 and 60 minutes after the scheduled 10:30 a.m. start time – was reasonable under the circumstances. Based on the fixed class and event schedule and the limited number of Techs available, Plaintiff's late arrival required that the classes and events to which he was scheduled be re-assigned to other Techs. The fact that Plaintiff's supervisors had to assign his work to other Techs when he exercised his right to intermittent FMLA does not obligate the EMC to permanently reassign Plaintiff's duties. *See Phelps v. Optima Health, Inc.*, 251 F.3d 21, 26 (1st Cir. 2001) (*ad hoc* accommodations made so that an employee could avoid a particular task did not constitute a concession that the task was non-essential).

**B.    Plaintiff Cannot Link His Disability To His Requested Accommodation.**

Under the ADA, an employee claiming failure to accommodate must demonstrate that his request for an accommodation was "sufficiently direct and specific" and that the request explained "how the accommodation requested [was] linked to some disability." *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001) (internal quotations omitted); *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 102-03 (1st Cir. 2007) (explaining "the plaintiff has the burden of showing" the sufficiency of his request for accommodation); *Estades-Negroni v. Assocs. Corp. of N. Am.*, 377 F.3d 58, 64 (1st Cir. 2004) ("Under the ADA, requests for accommodation must be express and must be linked to a disability.").

Although Plaintiff claims (in wholly conclusory fashion) that his disability "required a certain schedule," there is no evidence in the record to establish a link between his disability and the requested accommodation. Plaintiff has provided no medical documentation from any treatment provider that his requested accommodation is necessary for him to perform the essential functions of his job – reliably arriving to work at the time he provided to his supervisor. *See Farina v. Branford Bd. of Educ.*, 458 Fed. Appx. 13, 16 (2d Cir. 2011) (no evidence that a change to plaintiff's start time would eliminate plaintiff's persistent tardiness) *See Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.*, 447 F.3d 105, 112-13 (1st Cir. 2006) (finding no violation for denying plaintiff's request to relocate "her office from the first to the second floor" because it was not sufficiently linked "to [plaintiff's] claimed disability" of depression); *Francis v. Providence Sch. Bd.*, No. C.A. 04-04-T, 2005 WL 2179149, at *4–5 (D.R.I. Sept. 1, 2005), *aff'd*, 198 F. App'x 18 (1st Cir. 2006) ("With respect to [plaintiff]'s request that she be allowed to arrive 30 minutes late each day . . . she has failed to explain how the requested accommodations were necessitated by or connected to her alleged disability.").

II.     **The University Did Not Retaliate Against Plaintiff By Terminating His**

**Employment.**

In the Amended Complaint, Plaintiff claims that the University terminated his employment on October 7, 2014 in retaliation for (a) the request for accommodation he made to the University in November 2012, and (b) his decision to file a charge of discrimination with the EEOC in July 2013.[8] This claim must be dismissed.

As an initial matter, Plaintiff offers no direct evidence of retaliation. Therefore, to survive summary judgment, Plaintiff must establish a *prima facie* case of retaliation, showing that: (1) he was engaged in protected conduct; (2) he "suffered an adverse employment action;" and (3) there was a causal connection between the protected conduct and the adverse action. *Collazo v. Bristol–Myers Squibb Mfg., Inc.*, 617 F.3d 39, 46 (1st Cir. 2010). This is "a small showing that is not onerous and is easily made." *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003) (internal quotation marks and citation omitted). If Plaintiff makes out a *prima facie* case, the University must "articulate a legitimate, non-retaliatory reason" for the adverse action. *Collazo*, 617 F.3d at 46. At the third stage, the burden shifts back to Plaintiff to establish that the University's proffered reason is mere pretext for retaliatory animus. *Id.* Here, the University concedes that Plaintiff was engaged in protected conduct and that his termination was an adverse employment action. However, Plaintiff's retaliation claim fails because there is no causal connection between his protected activity and his termination.

> **A.   Plaintiff Cannot Establish A Causal Connection Between His Protected Activity And His Termination.**

To establish a causal connection, Plaintiff must show that the University acted *because* he engaged in a protected activity. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2523

---

[8] Although the Amended Complaint does not explicitly describe Plaintiff's protected activity, the University concedes that seeking a disability accommodation and filing a charge of discrimination each satisfy this element of Plaintiff's retaliation claim.

(2013). The connection requires proof of a legally sufficient nexus between protected conduct and the alleged retaliatory act. *Colón–Fontánez v. Municipality of San Juan*, 660 F.3d 17, 36–37 (1st Cir. 2011); *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003). In proper circumstances, the nexus may be established by temporal proximity between the relevant events. However, in those cases, the proximity must be "very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273–274 (2001).

In this case, Plaintiff's request for a disability accommodation is far too temporally remote from his termination to support an inference of causality. *Abril-Rivera v. Johnson*, 806 F.3d 599, 609 (1st Cir. 2015) (no inference of causality where adverse action was taken 14 months after protected activity). *See Morón–Barradas v. Dep't of Educ. of Commonwealth of P.R.,* 488 F.3d 472, 481 (1st Cir.2007) ("[M]ore than eight months . . . is . . . insufficient to establish temporal proximity."). Plaintiff sought a disability accommodation in November 2012. He was not terminated until October 2014 – nearly 23 months later. Similarly, the University was served with Plaintiff's EEOC complaint in mid-July 2013, nearly 15 months before his termination. These circumstances undercut any claim of causation.

Absent an inference of retaliation, Plaintiff must present additional evidence to demonstrate a causal connection. *See Mesnick,* 950 F.2d at 827.The evidence need not be direct; it can be circumstantial, and may include, among other things: "evidence of differential treatment in the workplace, statistical evidence showing disparate treatment . . .  and comments by the employer which intimate a retaliatory mindset." *See id. at 828* (citations omitted). Changes in an employer's treatment of its employee after the protected conduct can reveal a causal connection. *Simas v. First Citizens' Fed. Credit Union,* 170 F.3d 37, 51 (1st Cir. 1999). In this case, there is no evidence whatsoever that Milne or Mulkern, Plaintiff's supervisors, made any statements or

took any actions that hint at a retaliatory mindset. To the contrary, Milne and Mulkern exercised exceptional patience with Plaintiff and offered him chance after chance to meet the expectations of his position. Simply put, Plaintiff cannot point to any evidence to show that his termination was for the *purpose* of retaliating. *See Randlett v. Shalala,* 118 F.3d 857, 862 (1st Cir. 1997) ("the adverse action must have been taken for the *purpose* of retaliating"). Hence, Plaintiff fails to establish a *prima facie* case of retaliation.

**B.      The University Had A Legitimate, Non-Retaliatory Reason For Terminating Plaintiff's Employment.**

Even if Plaintiff could establish a *prima facie* case of retaliation, the University had a legitimate, non-retaliatory reason for terminating Plaintiff's employment in October 2014. The undisputed evidence shows that for more than three years, Plaintiff failed to meet the clearly articulated requirements of his position. In October 2011, November 2012, April 2014 and June 2014, Plaintiff received written warnings concerning his refusal to comply with the notification procedures. Two of these warning letters pre-date Plaintiff's request for a disability accommodation and two post-date Plaintiff's request. In addition, Plaintiff's supervisors met with him on many other occasions and emphasized the importance of calling in if he was going to arrive after 10:30 a.m. and providing the EMC with an accurate arrival time.

The unchallenged record in this case demonstrates that Plaintiff's supervisors in the EMC bent over backwards to accommodate him in spite of his long history of tardiness and persistent failure to comply with the notification procedures. Plaintiff was repeatedly warned and given numerous opportunities to improve his work attendance record. Furthermore, Plaintiff's chronic failure to comply with the notification procedures made it too difficult to assign staffing resources and significantly damaged morale among the Techs in the EMC, ultimately forcing the EMC into the position that it could "no longer justify [Plaintiff's] employment." *EEOC v. Yellow*

*Freight Sys. Inc.*, 253 F.3d 943, 950 (7th Cir. 2001).

> **C.      Plaintiff Cannot Show That The Stated Reason For Terminating His Employment Is A Pre-text For Retaliatory Animus.**

Finally, Plaintiff cannot offer any evidence that the University's stated reason for terminating his employment was a pretext or that Milne and Mulkern, the individuals who made the decision to terminate his employment, harbored any retaliatory animus against him. *See Bonefont-Igaravidez v. Int'l Shipping Corp.*, 659 F.3d 120, 126 (1st Cir. 2011) ("When assessing a claim of pretext in an employment discrimination case, the court must focus on the motivations and perceptions of the employer's decision maker") (internal citation omitted); *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 41 (1st Cir. 2001). One way to establish pretext is to show that the University (acting through Milne and Mulkern) gave "different and arguably inconsistent explanations" for its actions. *See Domínguez–Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 432 (1st Cir. 2000). "[W]eaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in their proffer can do the trick, *see Harrington v. Aggregate Indus.-Ne. Region, Inc.,* 668 F.3d 25, 33 (1st Cir. 2012) (internal quotation marks and citation omitted) -- unless the record conclusively reveals that the real motive was an unstated reason that is non-retaliatory, *see Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148 (2000). Here, Plaintiff cannot meet his burden.

First, Plaintiff cannot present any concrete evidence of animus. As set forth above, Plaintiff's supervisors spent more than three years addressing his performance issues and documenting their efforts to counsel Plaintiff. There is simply no evidence that these efforts were connected to Plaintiff's protected activity. Moreover, Plaintiff has not – and cannot – claim that either Milne or Mulkern made any comments to suggest retaliatory animus. The University has, in fact, identified a clear and specific reason for terminating Plaintiff's employment entirely

unrelated to any impulse to retaliate against him for protected conduct. The long history of Plaintiff's chronic tardiness and his persistent inability to comply with the notification procedures provided legitimate justification for termination entirely untainted by retaliatory animus.

## **CONCLUSION**

For the reasons set forth above, the University respectfully requests that this Court grant its motion for summary judgment and dismiss this case.

Respectfully submitted,

TRUSTEES OF BOSTON UNIVERSITY,
By its attorney,

/s/ Lisa A. Tenerowicz
_____
Lisa A. Tenerowicz (BBO # 654188)
latenero@bu.edu
Boston University
Office of the General Counsel
125 Bay State Road
Boston, MA 02215
(617) 353-2326

Dated:  March 31, 2017

## <u>CERTIFICATE OF SERVICE</u>

I, Lisa A. Tenerowicz, hereby certify that on March 31, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. The CM/ECF system will provide service of such filing via Notice of Filing to all listed parties. In addition, a copy of the foregoing document was also served upon Plaintiff James Zavaglia, 25 High Street, Salem, MA 01970, by email.

/s/ Lisa A. Tenerowicz

_____

Lisa A. Tenerowicz